**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| **KRISTIN TERRIZZI, as parent and natural guardian of M.T., a minor,** | ) | |
| **Plaintiff** | ) | |
| **v.** | ) | **No. 2:25-cv-00170-KFW** |
| **ACTON SCHOOL DEPARTMENT et al.,** | ) | |
| **Defendants** | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**[1]

In this case, Kristin Terrizzi (on behalf of her minor child M.T.) alleges that the Acton School Department, Jonathan Ross (Superintendent), Brandon Ward (Principal), and Carol Wendel (School Nurse) violated M.T.'s Constitutional and statutory rights by failing to properly supervise M.T.; failing to investigate or take corrective action in response to sexual harassment of M.T. by another student; and by subjecting him to an improper search. Complaint (ECF No. 1). The Defendants move for summary judgment. Motion (ECF No. 29). For the reasons that follow, the motion is granted.

## I. Undisputed Facts

Kristin Terrizzi is the mother of M.T. Final Statement of Material Facts (FSMF) (ECF No. 34) ¶ 1. Terrizzi enrolled M.T. in kindergarten at Acton

[1] The parties have consented to me presiding over all proceedings in this action including the entry of judgment. *See* ECF No. 12.

Elementary School from August 31, 2020, through January 23, 2021. *Id.* ¶ 2. M.T. was enrolled during all of second and third grade until October 10, 2024. *Id.* ¶¶ 3-4.

Before M.T. was enrolled in kindergarten, he already had an individualized education plan for preschool (Preschool IEP). *Id.* ¶ 11. On June 2, 2020, the IEP team met, with Terrizzi in attendance, to discuss M.T.'s transition from preschool to Acton Elementary. *Id.* ¶ 12. At the meeting, M.T.'s IEP team decided that he should continue to use his Preschool IEP. *Id.* ¶ 15. That IEP only reflected "home/school communication log, positive behavior support plan, and visual schedules and supports" in the "Supplementary Aids, Services, Modifications, and/or Supports" section. *Id.* ¶ 21. It did not require one-on-one supervision. *Id.* ¶¶ 15, 21.

After the June 2020 IEP meeting, Special Education Director Sharon Pray sent Terrizzi a written notice reflecting the team's decision to continue the goals and services in M.T.'s then-current Preschool IEP. *Id.* ¶¶ 16-17. Section 3 of the notice is titled "Describe each evaluation procedure, assessment, record or report the SAU used as a basis for the proposed or refused action(s). ECF No. 30-4 at 4. That section included a report for a special educator, which included the following language: "He engages in escaping behaviors such as tantrums. Visual schedule and first/then language works best with him. Set up low effort to high effort preferred activities from beginning of the day to end of the day. They recommend a small classroom, structured environment with one:one at all times and access mainstream activities as he able to."[2] *Id.* at 4. The notice does not say the IEP team amended M.T.'s

[2] The last sentence does not indicate who "they" refers to.

Preschool IEP. FSMF ¶ 18. It does indicate that the IEP team would follow up with another meeting four to six weeks after the start of the school year to review the goals and revise the IEP as needed. *Id.* ¶ 19. The Preschool IEP remained in effect through the transition from preschool to elementary school until February 3, 2021. *Id.* ¶¶ 13-14.

In September 2020, M.T. was injured when he fell from monkey bars during recess. *Id.* ¶ 22. The next month, the IEP team held a follow-up meeting.[3] *Id.* ¶¶ 22-23. At the meeting, the team added adult support in the general education setting to the plan. *Id.* ¶ 25. Terrizzi requested that adult support be added on the playground as well, and the school agreed and amended the IEP to include "[e]xtra adult support at recess to spot M.T. using climbing equipment" as one of the supplementary aids or supports. *Id.* ¶¶ 26-27. Terrizzi withdrew M.T. from kindergarten on January 23, 2021. *Id.* ¶ 29.

M.T. returned to school in Acton for second grade in 2023-2024. *Id.* ¶ 3. On May 9, 2024, Terrizzi wrote an email to M.T.'s second grade teacher stating that M.T. was complaining that a girl (L) stole M.T.'s "shoe lace (hickies) from his brand new shoes," was "constantly calling him names and picking on him," and that she "also is touching him inappropriately." *Id.* ¶ 30. Terrizzi also reported that M.T. had been complaining about L "for two weeks," including inappropriate touching and bullying. *Id.* ¶ 72. The teacher responded to Terrizzi the next day, saying,

> Thank you for reaching out to me! . . . . After I received your email I checked in with my teaching partner and the support staff that is in my

[3] Terrizzi requested that the October 2, 2020, IEP progress meeting be postponed until M.T. felt better, so the meeting was rescheduled and held on October 22 instead. *Id.* ¶¶ 22-23.

> room throughout the day to . . . see if there were any incidents that I was unaware of. My fellow staff members and I have not seen or heard of any of the incidents you described in your email. I can confidently say this because [M.T.] has an adult with him all day, and we have been proactive to prevent any incidents from occurring. We will continue to stay vigilant and practice in this situation. Please continue to keep me updated, I want to make sure that [M.T.] is feeling comfortable and safe here at school!

*Id.* ¶ 35. The teacher also told Terrizzi about the efforts she was making to help M.T. avoid being untruthful at school. *Id.* ¶ 36.

Early in M.T.'s third grade year, Terrizzi sent another email to the teacher, stating that L "has been bullying [M.T.]" and that

> M.T. has had a problem with ["L"] for the second year now. I was wondering what we can do because [M.T.] said that he is truly trying to be nice to her. We had a lot of talks over the summer how he would just be extra nice because mean people just need extra love. Anyway, sorry to go on. Maybe we can come up with a solution or next Maybe talk to her parents not sure what best solution is.

*Id.* ¶¶ 37-38. Following this email, the teacher facilitated a conversation between M.T. and L. *Id.* ¶¶ 39-40. She told L that unkind words would not be tolerated, and she told M.T. to let her know if he and L continued to have issues and that it was ok to walk away if someone was unkind. *Id.* ¶¶ 40-43. The teacher responded to Terrizzi's email a couple of hours later, summarized her conversation with L and M.T., and said she was proud of M.T., who she said apologized for not being kind. *Id.* ¶ 44. Terrizzi replied, "Thank you very much for talking with the kiddo's! I appreciate it so much and love how you handled the situation." *Id.* ¶ 45. After this conversation and email exchange, no further incidents occurred between M.T. and L. *Id.* ¶ 46.

On October 7, 2024, Principal Ward received a report from M.T.'s teacher that there may be an injury on M.T.'s back.[4] *Id.* ¶ 47. He spoke with Superintendent Ross about the allegation, and they decided to have Nurse Wendel evaluate M.T. *Id.* ¶ 48. Principal Ward went to M.T.'s class and asked M.T. to come with him so they could go together to check in with the nurse, and he told M.T. that he was not in trouble. *Id.* ¶¶ 49-50. Superintendent Ross, Principal Ward, Nurse Wendel, and M.T. convened in the Superintendent's office so that Nurse Wendel could check M.T.'s injury. *Id.* ¶ 51. Superintendent Ross explained to M.T. that Nurse Wendel would examine his back to see whether he had an injury. *Id.* ¶ 52. Nurse Wendel requested that both Principal Ward and Superintendent Ross be present for her examination of M.T.'s back, and they decided to use the Superintendent's office, rather than the Nurse's office, because it afforded more space and privacy from other students. *Id.* ¶¶ 54-56.

During the examination, Nurse Wendel sat at a small table, with M.T. standing at least an arm's distance away from her. *Id.* ¶ 58. Nurse Wendel asked M.T. to show her where he was hurt, and M.T. lifted the sleeve on his right arm, where a small, light bruise appeared. *Id.* ¶ 59. She then asked if she could look at his back, explaining that she wanted to see whether he had marks, and asked him to raise his shirt. *Id.* ¶ 60. The evaluation took only a few seconds. *Id.* ¶ 62. The parties dispute whether M.T.'s pants were pulled down during the examination. *Id.* ¶ 68.

---

[4] The School District had made two prior reports to DHHS about possible child abuse with this family. *Id.* ¶ 63.

On October 9, 2024, Terrizzi went to the York County Sheriff's Office to report the incident and explained that no officer had responded to her initial call. *Id.* ¶ 84. On October 15, 2024, Plaintiff emailed the District Attorney's Office stating she needed help because a few members of her child's school sexually assaulted him by having him pull his pants down to look at his private area. *Id.* ¶ 85. Terrizzi withdrew M.T. from Acton on October 10, 2024. *Id.* ¶ 64.

## II. Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute "is genuine if it can be resolved in favor of either party, and a fact is material if it has the potential of affecting the outcome of the case." *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (cleaned up). The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the nonmoving party must then respond "with sufficient evidence to allow a reasonable jury to find in its favor with respect to each issue on which it has the burden of proof." *Feliciano-Muñoz*, 970 F.3d at 62 (cleaned up).

In reviewing a motion for summary judgment, a court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *See EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 57 (1st Cir. 2021). Even when viewing evidence in a favorable light,

however, a court is not obligated to "draw unreasonable inferences or credit bald assertions or empty conclusions." *Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 348 (1st Cir. 2018) (cleaned up).

## IV. Discussion

Terrizzi asserts four causes of action in her complaint. Count I alleges a violation of M.T.'s Fourth Amendment Rights under 42 U.S.C. § 1983. Complaint at 9-10. Counts II and III allege violations of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. *Id.* at 10-14. Count IV alleges a violation of Title IX of the Education Act Amendments of 1972. *Id.* at 14-16. I address each in turn.

### A. Fourth Amendment[5]

The Defendants argue that they are entitled to summary judgment on Terrizzi's Fourth Amendment claim because the Fourth Amendment does not act as a bar to school staff examining "a third-grade student in order to confirm or deny a visual report of suspected abuse." Motion at 17. They emphasize that the context of M.T.'s examination was "wholly distinct" from Fourth Amendment cases involving disciplinary searches of students for drugs or contraband. *Id.* Terrizzi, on the other hand, argues that a jury could find that the examination of M.T. was unreasonable and points to *Safford Unified School District No. 1 v. Redding*, 557 U.S. 364, 369, 374-77 (2009), a case where the Supreme Court held that a school official's search of a student for drugs was unreasonable under the Fourth Amendment where the school

[5] 42 U.S.C § 1983 provides a cause of action against state actors who violate constitutional rights. *Parker v. Landry*, 935 F.3d 9, 14 (1st Cir. 2019).

official required the student to pull out her underwear and partially expose her breasts and pelvic area. *See* Response (ECF No. 31) at 15-16.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "The Fourth Amendment has been applied to public school officials, primarily in the investigation of student misconduct or crime." *Wojcik v. Town of North Smithfield*, 76 F.3d 1, 3 (1st Cir. 1996). Whether the Fourth Amendment extends to school officials' searches outside the disciplinary context is unsettled. *See, e.g.*, *Jones ex rel. A.H. v. District of Columbia*, 805 F. Supp. 3d 218, 235 (D.D.C. 2025) ("[T]he Fourth Amendment's prohibition on unreasonable searches and seizures extends to public school officials, but only when school officials are carrying out searches and other disciplinary functions pursuant to school policies." (cleaned up)).

Assuming that the Fourth Amendment applied to the search at issue in this case, the fundamental inquiry "is whether a particular search or search procedure is reasonable in the circumstances." *McCabe v. Life-Line Ambulance Serv., Inc.*, 77 F.3d 540, 544 (1st Cir. 1996). The Supreme Court has held that the "reasonableness inquiry" is "different in public schools than elsewhere," and that, in recognition of schools' "custodial and tutelary responsibility," "students within the school environment have a lesser expectation of privacy than members of the population generally." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656-57 (1995) (noting that, for "their own good," "public school children are routinely required to

submit to various physical examinations"). A "school search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student . . . ." *Safford Unified Sch. Dist. No. 1*, 557 U.S. at 370.

Here, the undisputed facts show that the Defendants' objective was to investigate a reported injury on M.T.'s back in the broader context of suspected abuse. Their interest in protecting M.T. from abuse was very strong.[6] *See Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 356-57 (1st Cir. 2025) (noting that school officials have "a compelling interest in protecting the physical and psychological well-being of minors" (cleaned up)); *Brown v. Ives*, 129 F.3d 209, 212 (1st Cir. 1997) ("The state has a very strong interest, repeatedly recognized, in the protection of children from abuse, whether by their parents or anyone else."). And their examination of M.T. was reasonably related to their objective. Weighing M.T.'s reduced expectation of privacy as a third-grade student against the Defendant's compelling interest in protecting him from abuse, it was not *excessively* intrusive for them to inspect his back and (accepting his version of events[7]) his bottom for a few seconds in the privacy of a closed office, and Terrizzi cites no caselaw suggesting otherwise.

Accordingly, the Defendants' search of M.T. was reasonable in the circumstances and they are entitled to summary judgment on Terrizzi's Fourth

---

[6] Under Maine law, school personnel are mandatory reporters of suspected child abuse. *See* 22 M.R.S.A. § 4011-A(1), (A-1)(1).

[7] M.T. testified at his deposition that he did not remember what occurred on October 7, 2024, but rather testified to what his mother reminded him of. *Id.* ¶ 67. M.T. testified that he "sensed" that Ross, Wendel, and Ward collectively pulled down his pants and looked at his "butt" for "about five seconds." *Id.* ¶ 68. After which, Wendel said, "See, it's not so bad." *Id.* ¶ 69.

Amendment claim. *See Geffre v. Metro. Council*, 174 F. Supp. 2d 962, 965 (D. Minn. 2001) ("The question of whether a particular search is reasonable for purposes of the Fourth Amendment is a question of law, making it appropriate for summary judgment."); *United States v. Bain*, 874 F.3d 1, 16 (1st Cir. 2017) (reiterating that the "reasonableness of a search is a question of law").

**B. ADA and Rehabilitation Act Claims**

Count II alleges a violation of Title II of the Americans with Disabilities Act, Count III alleges a violation of Section 504 of the Rehabilitation Act of 1973, and both counts seek compensatory damages.[8] Complaint ¶¶ 68-90. The ADA and Section 504 protect "children with disabilities, in both public schools and other settings." *Fry v. Napoleon Cmty. Sch.,* 580 U.S. 154, 159 (2017). Given the textual similarities between Title II and Section 504, the same standards govern claims under both, and I rely on cases construing Title II and Section 504 interchangeably. *See Parker v. Universidad de P.R.,* 225 F.3d 1, 4 (1st Cir. 2000) (explaining that Title II "is modeled on § 504 of the Rehabilitation Act," and "[i]n applying Title II . . . we rely interchangeably on decisional law applying § 504").

The school argues that it is entitled to summary judgment on these counts for two reasons. First, the record contains no evidence of disability-based animus

[8] Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 provides "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).

(a required element for compensatory damages). Motion at 7-8. Second, the undisputed facts show the school was following the IEP when M.T. was injured. *Id.* at 8-9. Terrizzi counters that disability-based animus is not a required element, that deliberate indifference to disability-related needs is sufficient, and that a dispute of fact exists as to whether the school knew it needed to provide one-on-one supervision. Response at 508.

The First Circuit Court of Appeals has not directly addressed which standard is required to show intentional discrimination by a school under the ADA. It has suggested that a plaintiff "may" need to make "some showing of deliberate indifference not required by" the IDEA, to recover under Section 504. *Nieves-Márquez v. P.R.,* 353 F.3d 108, 125 n.17 (1st Cir. 2003). Because cases citing Section 504 and Title II of the ADA are relied on interchangeably, it is reasonable to assume that the First Circuit would apply the "deliberate indifference" standard to ADA-based discrimination claims.

Even under the deliberate indifference standard, however, Terrizzi has not presented enough evidence to survive summary judgment. *See Feliciano-Muñoz*, 970 F.3d at 62 (requiring the nonmoving party to respond "with sufficient evidence to allow a reasonable jury to find in its favor with respect to each issue on which it has the burden of proof." (cleaned up)). In this context, deliberate indifference "requires proof that the defendant knew that an ADA-protected right was likely to be abridged, yet neglected to take available preventative action notwithstanding such knowledge." *Gray v. Cummings*, 917 F.3d 1, 18 (1st Cir. 2019).

"[T]his is a very high standard," and it has not been met here. *See H. v. Montgomery Cnty. Bd. of Educ.*, 784 F. Supp. 2d 1247, 1268 (M.D. Ala. 2011). The undisputed facts demonstrate that the school diligently implemented M.T.'s IEP. The IEP team, including Terrizzi, met before M.T. started school at Acton Elementary to discuss his transition. FSMF ¶¶ 11-12; ECF No. 30-2 ¶ 5. Terrizzi attended that meeting. *Id.* At the meeting, the team decided that the Preschool IEP would remain in place. FSMF ¶ 15. Following the meeting, Terrizzi received a written notice reflecting the IEP team's decision. *Id.* ¶ 16. That notice included a single statement from a special education teacher—who was one member of the nine person IEP team—recommending "a small classroom, structured environment with one:one at all times and access mainstream activities as he able to." ECF No. 30-4 at 5. In this context, a teacher's statement alone did not put the Defendants on notice that M.T. was likely to injure himself on the playground as a result of his disability, especially when the school complied with the IEP that was in place at the time of M.T.'s injury. *Id.* ¶¶ 15, 17, 21; IEP (ECF No. 28-2); *see Baker v. S. York Cnty. Sch. Dist.*, No. 1:08-CV-1741, 2012 WL 6561434, at *5 (M.D. Pa. Dec. 17, 2012) ("Instead of deliberate indifference, the record demonstrates that the District carefully and diligently engaged in the process of developing and implementing an IEP.").

Terrizzi argues that she repeatedly raised concerns about supervision and safety. However, the record citations she provides do not properly contravene the fact that the IEP did not include one-on-one supervision. She cites the written notice, saying that it includes "parent concerns." FSMF ¶ 21; ECF No. 30-4. It contains no

references to parental concerns regarding the playground. *Id.* She cites the written notice from the meeting after the injury on the playground, in which she stated that she "would like for him to be well supervised with a 'spotter' if he is on the monkey bars, at least until he is able to navigate the monkey bars." *Id.*; ECF No. 30-6. But requests for changes to an IEP after the injury occurred do not bear on whether the school was deliberately indifferent in the first instance. *Cf. Fortin ex rel. TF v. Hollis Sch. Dist.*, 2017 WL 4157065, at *4 (D.N.H. Sept. 18, 2017) ("The plaintiffs here concede that Hollis was unaware of the assaults on TF until after they occurred. Absent such knowledge, Hollis cannot have been deliberately indifferent to the actions taken against TF." (cleaned up)).

"No matter how the loaf is sliced," Terrizzi has failed to set forth evidence showing that the school knew that a lack of supervision would deprive M.T. of an ADA or Section 504 right. *See Gray*, 917 F.3d at 18 (requiring plaintiffs, at a "bare minimum," to make out a genuine issue of material fact as to a defendant's deliberate indifference to the risk of an ADA violation").

**C. Title IX**

The Defendants argue that they are entitled to summary judgment on Terrizzi's Title IX (Count IV) and the claim should be limited to the alleged bullying and harassment by student L. Motion at 16. During discovery, Terrizzi tried to expand the grounds for the Title IX claim in her response to interrogatories by including the examination by Nurse Wendel, Superintendent Ross, and Principal Ward as an alleged Title IX violation. FSMF ¶ 66. Terrizzi served her answer to the

relevant interrogatory on January 13, 2026, eleven days after discovery closed. *Id.*; ECF No. 17 (setting the deadline for discovery).

Although proceeding on claims different from those in the original pleading is possible, it is reserved for situations where both parties understand and acquiesce to the change. *See Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 232 (1st Cir. 2003) ("It is not enough that an issue may be inferentially suggested by incidental evidence in the record; the record must indicate that the parties understood that the evidence was aimed at an unpleaded issue." (cleaned up)). That is not the case here, and Terrizzi cannot expand her Title IX claim by answering an interrogatory after the close of discovery. *See Duplessis v. Training & Dev. Corp.*, 821 F. Supp. 43, 44 (D. Me. 1993) ("Having failed to raise this issue in his Complaint, Plaintiff cannot now augment his allegations in an effort to create a material issue of fact."). Thus, I limit my analysis to the undisputed facts regarding the alleged harassment by L.

To state a claim under Title IX for student-on-student harassment, a plaintiff must show

> (1) that he or she was subject to severe, pervasive, and objectively offensive sexual harassment by a school peer, and (2) that the harassment caused the plaintiff to be deprived of educational opportunities or benefits . . . (3) [the school] knew of the harassment, (4) in its programs or activities and (5) it was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances.

*Porto v. Town of Tewksbury*, 488 F.3d 67, 72-73 (1st Cir. 2007). The undisputed material facts fail to establish any of these elements. Terrizzi sent three emails to

the school regarding harassment, one in May 2024, another in September 2024, and one in October 2024 expressing concern about bruises on M.T. that were from a scuffle with other kids. FSMF ¶¶ 30, 37-38, 75. M.T.'s teachers promptly responded. *Id.* ¶¶ 35, 44. In response to the second email, M.T.'s teacher spoke with both students about appropriate conduct and, from that point on, there were no more incidents with L. *Id.* ¶¶ 44-46. This is not the severe, pervasive, and objectively offensive sexual harassment by a school peer that creates school liability for student-on-student harassment. The school's response was reasonable, as shown by the fact that no further bullying occurred between the students. *Id.*

Finally, there are no facts in the summary judgment record (or even allegations in the complaint) suggesting that the bullying was undertaken "on the basis of sex," which is the "sine qua non of a Title IX sexual harassment case." *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (1st Cir. 2002). The conclusory label "sexual harassment," on its own, does not establish either that there was harassment or that it was undertaken on the basis of sex. *See Harrington v. City of Attleboro*, 172 F. Supp. 3d 337, 344 (D. Mass. 2016) ("To constitute sex-based discrimination under Title IX, the alleged name calling, comments and physical assault of [a student] by her peers, must have been because of her sex." (cleaned up)). Without a genuine dispute about whether M.T. was harassed and bullied on the basis of sex, the school is entitled to summary judgment on Count IV.

## V. Conclusion

For the foregoing reasons, I **GRANT** summary judgment on Counts I-IV.

Dated: September 30, 2026

/s/Karen Frink Wolf
United States Magistrate Judge